# ENGLISH *v.* GENERAL ELECTRIC CO.

No. 89–152.   Argued April 25, 1990—Decided June 4, 1990

BLACKMUN, J., delivered the opinion for a unanimous Court.

*M. Travis Payne* argued the cause for petitioner. With him on the briefs was *Arthur M. Schiller*.

*Christopher J. Wright* argued the cause for the United States as *amicus curiae* urging reversal.   With him on the brief were *Solicitor General Starr, Deputy Solicitor General Roberts, Allen H. Feldman, Steven J. Mandel,* and *Jeffrey A. Hennemuth.*

*Carter G. Phillips* argued the cause for respondent.   With him on the brief were *Rex E. Lee, Benjamin W. Heineman, Jr., Philip A. Lacovara,* and *Barton A. Smith.**

JUSTICE BLACKMUN delivered the opinion of the Court.

In the particular context of this case we must decide whether federal law pre-empts a state-law cause of action for intentional infliction of emotional distress.   The suit is brought by an employee of a nuclear-fuels production facility against her employer and arises out of actions by the employer allegedly taken in retaliation for the employee's nuclear-safety complaints.

I

Petitioner Vera M. English was employed from 1972 to 1984 as a laboratory technician at the nuclear-fuels production facility operated by respondent General Electric Company (GE) in Wilmington, N. C.   In February 1984, petitioner complained to GE's management and to the Nuclear Regulatory Commission (NRC) about several perceived violations of nuclear-safety standards at the facility, including

---

*Briefs of *amici curiae* urging reversal were filed for the Attorney General of North Carolina et al. by *Lacy H. Thornburg,* Attorney General, *pro se, John C. Brooks, pro se, Donnell Van Noppen III,* and *Michael G. Okun;* for the National Conference of State Legislatures et al. by *Benna Ruth Solomon;* and for the Plaintiff Employment Lawyers Association by *J. Michael McGuinness* and *Paul Tobias.*

*Nicholas S. Reynolds* and *Richard K. Walker* filed a brief for the Nuclear Management and Resources Council, Inc., as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the Government Accountability Project by *Louis A. Clark;* and for the National Whistleblower Center by *Stephen M. Kohn* and *Michael D. Kohn.*

the failure of her co-workers to clean up radioactive material spills in the laboratory.

Frustrated by the company's failure to address her concerns, petitioner on one occasion deliberately failed to clean a work table contaminated with a uranium solution during a preceding shift. Instead, she outlined the contaminated areas with red tape so as to make them conspicuous. A few days later, petitioner called her supervisor's attention to the marked-off areas, which still had not been cleaned. As a result, work was halted while the laboratory was inspected and cleaned.

Shortly after this episode, GE charged petitioner with a knowing failure to clean up radioactive contamination and temporarily assigned her to other work. On April 30, 1984, GE's management informed petitioner that she would be laid off unless, within 90 days, she successfully bid for a position in an area of the facility where she would not be exposed to nuclear materials. On May 15, petitioner was notified of the company's final decision affirming the disciplinary action taken against her. Petitioner did not find another position by July 30, and her employment was terminated.[1]

In August, petitioner filed a complaint with the Secretary of Labor charging GE with violating § 210(a) of the Energy Reorganization Act of 1974, as added, 92 Stat. 2951, 42 U. S. C. § 5851(a) (1982 ed.), which makes it unlawful for an employer in the nuclear industry to

> "discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee . . .
>
> "(1) commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this Act or the Atomic Energy Act of 1954, as

---

[1] Although, technically, petitioner was placed on a layoff status on July 30, and retained certain benefits and recall rights at that point, as a practical matter she no longer was employed by GE after that date.

amended, or a proceeding for the administration or enforcement of any requirement imposed under this Act or the Atomic Energy Act of 1954, as amended;

"(2) testified or is about to testify in any such proceeding or;

"(3) assisted or participated or is about to assist or participate in any manner in such a proceeding . . . or in any other action to carry out the purposes of this Act or the Atomic Energy Act of 1954, as amended."[2]

In her charge, petitioner alleged that GE's actions constituted unlawful employment discrimination in retaliation for her nuclear-safety complaints to GE's management and to the NRC. An Administrative Law Judge (ALJ) to whom the matter was referred found that GE had violated § 210(a) when it transferred and then discharged petitioner. The Secretary, however, dismissed the complaint as untimely because it had not been filed, as required by § 210(b)(1), within 30 days after the May 15 notice of the company's final decision.[3]

---

[2] If an employee believes that he has been discharged or otherwise discriminated against in violation of the statute, he may file a complaint with the Secretary of Labor within 30 days after the violation occurs. § 210(b)(1). The Secretary then must investigate the alleged violation, hold a public hearing, and, within 90 days of receiving the complaint, issue an order that either provides or denies relief. § 210(b)(2)(A). If a violation is found, the Secretary may order reinstatement with backpay, award compensatory damages, and require the violator to pay the employee's costs and attorney's fees. § 210(b)(2)(B). Any person adversely affected by an order of the Secretary may obtain judicial review in the appropriate United States court of appeals, and either the Secretary or the complainant may seek enforcement of the Secretary's order in United States district court. §§ 210(c) through (e).

[3] The United States Court of Appeals for the Fourth Circuit affirmed that decision but remanded the case for consideration of petitioner's separate claim that she was subjected to a continuing course of retaliatory harassment after the May 15 disciplinary decision. *English* v. *Whitfield*, 858 F. 2d 957 (1988). Upon remand, the ALJ concluded that that claim,

In March 1987, petitioner filed a diversity action against GE in the United States District Court for the Eastern District of North Carolina. Petitioner in four counts raised two claims, one for wrongful discharge and one for intentional infliction of emotional distress.[4] With respect to the latter, petitioner alleged that she was suffering from severe depression and emotional harm as a result of GE's "extreme and outrageous conduct." App. 20. Petitioner alleged that, in addition to transferring and ultimately firing her, GE (1) had removed her from the laboratory position under guard "as if she were a criminal," *id.*, at 14; (2) had assigned her to degrading "make work" in her substitute assignment, *ibid.*; (3) had derided her as paranoid; (4) had barred her from working in controlled areas; (5) had placed her under constant surveillance during working hours; (6) had isolated her from coworkers, even during lunch periods; and (7) had conspired to charge her fraudulently with violations of safety and criminal laws. *Id.*, at 14–17. Petitioner sought punitive as well as compensatory damages.

Although the District Court concluded that petitioner had stated a valid claim for intentional infliction of emotional distress under North Carolina law, it nonetheless granted GE's motion to dismiss. 683 F. Supp. 1006, 1017–1018 (1988). The court did not accept GE's argument that petitioner's claim fell within the field of nuclear safety, a field that, according to GE, had been completely pre-empted by the Federal Government. The court held, however, that petitioner's claim was pre-empted because it conflicted with three particular aspects of § 210: (1) a provision that bars recovery under the section to any employee who "deliberately causes a violation of any requirement of [the Energy Reorga-

---

also, should be dismissed as time barred. The ALJ's recommended decision on this issue is still pending before the Secretary.

[4] The District Court ruled that petitioner had not made out a claim under state law for wrongful discharge. Because petitioner has not appealed that ruling, the wrongful-discharge claim is not now before us.

nization Act,] or of the Atomic Energy Act," § 210(g); (2) the absence of any provision generally authorizing the Secretary to award exemplary or punitive damages; and (3) the provisions requiring that a whistle-blower invoking the statute file an administrative complaint within 30 days after the violation occurs, and that the Secretary resolve the complaint within 90 days after its filing. See §§ 210(b)(1) and (b)(2)(A). In the court's view, Congress enacted this scheme to foreclose all remedies to whistle-blowers who themselves violate nuclear-safety requirements, to limit exemplary damages awards against the nuclear industry, and to guarantee speedy resolution of allegations of nuclear-safety violations — goals the court found incompatible with the broader remedies petitioner sought under state tort law.

The United States Court of Appeals for the Fourth Circuit affirmed the dismissal of petitioner's emotional distress claim on the basis of the District Court's reasoning. 871 F. 2d 22, 23 (1989). That court concluded that Congress had intended to foreclose nuclear whistle-blowers from pursuing state tort remedies and stated its belief that the District Court "correctly identified and applied the relevant federal and state law." *Id.*, at 23. Because of an apparent conflict with a decision of the First Circuit, see *Norris* v. *Lumbermen's Mutual Casualty Co.*, 881 F. 2d 1144 (1989), we granted certiorari. 493 U. S. 1055 (1990).

## II

### A

The sole question for our resolution is whether the Federal Government has pre-empted petitioner's state-law tort claim for intentional infliction of emotional distress. Our cases have established that state law is pre-empted under the Supremacy Clause, U. S. Const., Art. VI, cl. 2, in three circumstances. First, Congress can define explicitly the extent to which its enactments pre-empt state law. See *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 95–98 (1983). Pre-

emption fundamentally is a question of congressional intent, see *Schneidewind* v. *ANR Pipeline Co.*, 485 U. S. 293, 299 (1988), and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.

Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where an Act of Congress "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). Although this Court has not hesitated to draw an inference of field pre-emption where it is supported by the federal statutory and regulatory schemes, it has emphasized: "Where . . . the field which Congress is said to have pre-empted" includes areas that have "been traditionally occupied by the States," congressional intent to supersede state laws must be "'clear and manifest.'" *Jones* v. *Rath Packing Co.*, 430 U. S. 519, 525 (1977), quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S., at 230.

Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, see, *e. g.*, *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941). See also *Maryland* v. *Louisiana*, 451 U. S. 725, 747 (1981).[5]

---

[5] By referring to these three categories, we should not be taken to mean that they are rigidly distinct. Indeed, field pre-emption may be under-

It is undisputed that Congress has not explicitly pre-empted petitioner's state-law tort action by inserting specific pre-emptive language into any of its enactments governing the nuclear industry. The District Court and apparently the Court of Appeals did not rest their decisions on a field pre-emption rationale either, but rather on what they considered an actual tension between petitioner's cause of action and the congressional goals reflected in § 210. In this Court, respondent seeks to defend the judgment both on the lower courts' rationale and on the alternative ground that petitioner's tort claim is located within a field reserved for federal regulation—the field of nuclear safety. Before turning to the specific aspects of § 210 on which the lower courts based their decisions, we address the field pre-emption question.

## B

This is not the first case in which the Court has had occasion to consider the extent to which Congress has pre-empted the field of nuclear safety. In *Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190 (1983), the Court carefully analyzed the congressional enactments relating to the nuclear industry in order to decide whether a California law that conditioned the construction of a nuclear powerplant on a state agency's approval of the plant's nuclear-waste storage and disposal facilities fell within a pre-empted field. Although we need not repeat all of that analysis here, we summarize briefly the Court's discussion of the actions Congress has taken in the nuclear realm and the conclusions it drew from these actions.

Until 1954, the use, control, and ownership of all nuclear technology remained a federal monopoly. The Atomic Energy Act of 1954, 68 Stat. 919, as amended, 42 U. S. C.

stood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation. Nevertheless, because we previously have adverted to the three-category framework, we invoke and apply it here.

§ 2011 *et seq.* (1982 ed.), stemmed from Congress' belief that the national interest would be served if the Government encouraged the private sector to develop atomic energy for peaceful purposes under a program of federal regulation and licensing. The Act implemented this policy decision by opening the door to private construction, ownership, and operation of commercial nuclear-power reactors under the strict supervision of the Atomic Energy Commission (AEC). See *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S. 59, 63 (1978). The AEC was given exclusive authority to license the transfer, delivery, receipt, acquisition, possession, and use of all nuclear materials. As was observed in *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.,* 435 U. S. 519, 550 (1978): "The [Federal Government's] prime area of concern in the licensing context . . . [was] national security, public health, and safety." With respect to these matters, no significant role was contemplated for the States.

In 1959, Congress amended the Atomic Energy Act in order to "clarify the respective responsibilities . . . of the States and the [Federal Government] with respect to the regulation of byproduct, source, and special nuclear materials," 42 U. S. C. § 2021(a)(1) (1982 ed.), and generally to increase the States' role. The 1959 amendments authorized the AEC, by agreements with state governors, to discontinue the Federal Government's regulatory authority over certain nuclear materials under specified conditions. State regulatory programs adopted under the amendment were required to be "coordinated and compatible" with those of the AEC. § 2021(g).

In 1974, Congress passed the Energy Reorganization Act, 88 Stat. 1233, 42 U. S. C. § 5801 *et seq.* (1982 ed.), which abolished the AEC and transferred its regulatory and licensing authority to the NRC. § 5841(f). The 1974 Act also expanded the number and range of safety responsibilities under the NRC's charge. As was observed in *Pacific Gas,* the

NRC does not purport to exercise its authority based upon economic considerations, but rather is concerned primarily with public health and safety. See 461 U. S., at 207. Finally, in 1978, Congress amended both the Atomic Energy Act and the Energy Reorganization Act. Pub. L. 95–601, 92 Stat. 2947. Among these amendments is § 210, 42 U. S. C. § 5851 (1982 ed.), which, as discussed above, encourages employees to report safety violations and provides a mechanism for protecting them against retaliation for doing so.

After reviewing the relevant statutory provisions and legislative history, the Court in *Pacific Gas* concluded that "the Federal Government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States." 461 U. S., at 212. Although we ultimately determined that the California statute at issue there did not fall within the pre-empted field, we made clear our view that Congress intended that only "the Federal Government should regulate the radiological safety aspects involved in the construction and operation of a nuclear plant." *Id.*, at 205. In the present dispute, respondent and petitioner disagree as to whether petitioner's tort action falls within the boundaries of the pre-empted field referred to in *Pacific Gas*.

Respondent maintains that the pre-empted field of "nuclear safety" is a large one, and that § 210 is an integral part of it. Specifically, respondent contends that because the Federal Government is better able to promote nuclear safety if whistle-blowers pursue the federal remedy, *the whole area* marked off by § 210 should be considered part of the pre-empted field identified in *Pacific Gas*. Accordingly, respondent argues that all state-law remedies for conduct that is covered by § 210 are pre-empted by Congress' decision to have the Federal Government exclusively regulate the field of nuclear safety.

Petitioner and the United States as *amicus curiae*, on their part, contend that petitioner's claim for intentional infliction of emotional distress is not pre-empted because the

Court made clear in *Pacific Gas* that state laws supported by nonsafety rationales do not lie within the pre-empted field. They argue that since the state tort of intentional infliction of emotional distress is supported by a nonsafety rationale—namely, the State's "substantial interest in protecting its citizens from the kind of abuse of which [petitioner] complain[s]," see *Farmer* v. *Carpenters*, 430 U. S. 290, 302 (1977)—petitioner's cause of action must be allowed to go forward.

We think both arguments are somewhat wide of the mark. With respect to respondent's contention, we find no "clear and manifest" intent on the part of Congress, in enacting § 210, to pre-empt all state tort laws that *traditionally* have been available to those persons who, like petitioner, allege outrageous conduct at the hands of an employer. Indeed, acceptance of respondent's argument would require us to conclude that Congress has displaced not only state tort law, which is at issue in this case, but also state *criminal* law, to the extent that such criminal law is applied to retaliatory conduct occurring at the site of a nuclear employer. For example, if an employer were to retaliate against a nuclear whistle-blower by hiring thugs to assault the employee on the job (conduct literally covered by § 210), respondent's position would imply that the state criminal law prohibiting such conduct is within the pre-empted field. We simply cannot believe that Congress intended that result. Instead, we think the District Court was essentially correct in observing that while § 210 obviously bears some relation to the field of nuclear safety, its "paramount" purpose was the protection of employees.[6] See 683 F. Supp., at 1013. Accordingly, we see no basis for respondent's contention that all state-law claims arising from conduct covered by the section are necessarily included in the pre-empted field.

---

[6] In this regard, we note that the enforcement and implementation of § 210 was entrusted by Congress not to the NRC—the body primarily responsible for nuclear safety regulation—but to the Department of Labor.

Nor, however, can we accept petitioner's position, or the reading of *Pacific Gas* on which it is based. It is true that the holding in that case was premised, in part, on the conclusion that the California ban on nuclear construction was not motivated by safety concerns. Indeed, the majority of the Court suggested that a "state moratorium on nuclear construction grounded in safety concerns falls squarely within the prohibited field." 461 U. S., at 213. In other words, the Court defined the pre-empted field, in part, by reference to the motivation behind the state law. This approach to defining the field had some support in the text of the 1959 amendments to the Atomic Energy Act, which provided, among other things, that "[n]othing in this section shall be construed to affect the authority of any State or local agency to regulate activities *for purposes other than protection against radiation hazards*." 42 U. S. C. § 2021(k) (1982 ed.) (emphasis added). But the Court did not suggest that a finding of safety motivation was *necessary* to place a state law within the pre-empted field. On the contrary, it took great pains to make clear that state regulation of matters directly affecting the radiological safety of nuclear-plant construction and operation, "even if enacted out of nonsafety concerns, would nevertheless [infringe upon] the NRC's exclusive authority." 461 U. S., at 212. Thus, even as the Court suggested that part of the pre-empted field is defined by reference to the purpose of the state law in question, it made clear that another part of the field is defined by the state law's actual effect on nuclear safety.

Because it is clear that the state tort law at issue here is not motivated by safety concerns, the former portion of the field argument is not relevant.[7] The real issue, then, is

-------

[7]Two Justices thought that since the California statute at issue in *Pacific Gas* was not motivated by safety concerns, there was no reason for the majority to discuss this portion of the field argument there either. See 461 U. S., at 223–224. Whether the suggestion of the majority in *Pacific Gas* that legislative purpose is relevant to the definition of the pre-empted

whether petitioner's tort claim is so related to the "radiological safety aspects involved in the . . . operation of a nuclear [facility]," see *id.*, at 205, that it falls within the pre-empted field. In addressing this issue, we must bear in mind that not every state law that in some remote way may affect the nuclear safety decisions made by those who build and run nuclear facilities can be said to fall within the pre-empted field. We have no doubt, for instance, that the application of state minimum wage and child labor laws to employees at nuclear facilities would not be pre-empted, even though these laws could be said to affect tangentially some of the resource allocation decisions that might have a bearing on radiological safety. Instead, for a state law to fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels. We recognize that the claim for intentional infliction of emotional distress at issue here may have some effect on these decisions, because liability for claims like petitioner's will attach additional consequences to retaliatory conduct by employers. As employers find retaliation more costly, they will be forced to deal with complaints by whistle-blowers by other means, including altering radiological safety policies. Nevertheless, we believe that this effect is neither direct nor substantial enough to place petitioner's claim in the pre-empted field.

This result is strongly suggested by the decision in *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238 (1984). The Court there held that a claim for punitive damages in a state tort action arising out of the escape of plutonium from a federally licensed nuclear facility did not fall within the pre-empted field discussed in *Pacific Gas*. The Court reached this result notwithstanding the "tension between the conclusion

---

field is part of the holding of that case is not an issue before us today because, as discussed above, even if safety motivation is relevant, petitioner's broad suggestion that safety motivation is necessary to a finding that a particular state law falls within the occupied field lacks merit.

that [radiological] safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages [including punitive damages] based on its own law of liability" governing unsafe working conditions. 464 U. S., at 256. Although the decision in *Silkwood* was based in substantial part on legislative history suggesting that Congress did not intend to include in the pre-empted field state tort remedies for radiation-based injuries, see *id.*, at 251–256, we think it would be odd, if not irrational, to conclude that Congress intended to include tort actions stemming from retaliation against whistle-blowers in the pre-empted field but intended not to include tort actions stemming from radiation damage suffered as a result of actual safety violations. Potential liability for the kind of claim at issue in *Silkwood* will affect radiological safety decisions more directly than will potential liability under the kind of claim petitioner raises, because the tort claim in *Silkwood* attaches additional consequences to safety violations themselves, rather than to employer conduct that merely arises from allegations of safety violations. Moreover, and related, the prospect of compensatory and punitive damages for radiation-based injuries will undoubtedly affect nuclear employers' primary decisions about radiological safety in the construction and operation of nuclear power facilities far more substantially than will liability under the kind of claim petitioner asserts. It is thus not surprising that we find no evidence of a "clear and manifest" intent on the part of Congress to pre-empt tort claims like petitioner's. Cf. *Goodyear Atomic Corp.* v. *Miller*, 486 U. S. 174, 186 (1988) (increased workers' compensation award for injury caused by a safety violation at a Government-owned nuclear facility is "incidental regulatory pressure" that Congress finds acceptable). Accordingly, we conclude that petitioner's claim does not lie within the pre-empted field of nuclear safety.[8]

---

[8] Respondent relies, see Brief for Respondent 45–49, on decisions construing the pre-emptive effect of the National Labor Relations Act

## C

We now turn to the question whether, as the lower courts concluded, petitioner's claim conflicts with particular aspects of § 210.  On its face, the section does no more than grant a federal administrative remedy to employees in one industry against one type of employer discrimination—retaliation for whistle-blowing.  Ordinarily, the mere existence of a federal regulatory or enforcement scheme, even one as detailed as § 210, does not by itself imply pre-emption of state remedies. The Court has observed: "Undoubtedly, every subject that merits congressional legislation is, by definition, a subject of national concern.  That cannot mean, however, that every federal statute ousts all related state law. . . . Instead, we must look for special features warranting pre-emption." *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707, 719 (1985).  Here, the District Court identified three "special features" of § 210 that it believed were incompatible with petitioner's claim.

The District Court relied first on § 210(g), which provides that "Subsection (a) of this section [the prohibition on employer retaliation] shall not apply" where an employee "deliberately causes a violation of any requirement of this Act or of the Atomic Energy Act."  According to the District Court and respondent, this section reflects a congressional desire to preclude *all* relief, including state remedies, to a whistle-blower who deliberately commits a safety violation referred

(NLRA), 29 U. S. C. § 151 *et seq.*, to argue that petitioner's claim falls within the pre-empted field.  We regard this reliance as misplaced.  To begin with, the NLRA, unlike statutes governing the nuclear-employment field, comprehensively deals with labor-management relations from the inception of organizational activity through the negotiation of a collective-bargaining agreement.  Moreover, special factors support the conclusion that pre-emption of state labor relations law is warranted—specifically, Congress' perception that the NLRA was needed because state legislatures and courts were unable to provide an informed and coherent labor policy.  See *Motor Coach Employees* v. *Lockridge*, 403 U. S. 274, 286 (1971).

to in § 210(g). Permitting any state-law claim based on whistle-blowing retaliation, the court reasoned, would frustrate this congressional objective. We do not agree. As an initial matter, we note that the text of § 210(g) specifically limits its applicability to the remedy provided by § 210(a) and does not suggest that it bars state-law tort actions. Nor does the legislative history of § 210 reveal a clear congressional purpose to supplant state-law causes of action that might afford broader relief. Indeed, the only explanation for any of the statute's remedial limitations is the Committee Report's statement that employees who deliberately violate nuclear-safety requirements would be denied protection under § 210(g) "[i]n order to avoid abuse of the protection afforded *under this section.*" S. Rep. No. 95–848, p. 30 (1978) (emphasis added).

In any event, even if the District Court and respondent are correct in concluding that Congress wanted those who deliberately commit nuclear-safety violations, as defined under § 210(g), to be denied all remedies against employer retaliation, this federal interest would be served by pre-empting state law only to the extent that it afforded recovery *to such violators.* See *Norris* v. *Lumbermen's Mutual Casualty Co.*, 881 F. 2d 1144, 1150 (CA1 1989). In the instant case, the ALJ found that petitioner had not deliberately committed a safety violation within the meaning of § 210(g), App. to Pet. for Cert. 44a, and neither the Secretary nor the lower courts have suggested otherwise. Thus, barring petitioner's tort action would not even serve the federal interest the lower courts and respondent have gleaned from their reading of this section.

The District Court also relied on the absence in § 210 of general authorization for the Secretary to award exemplary damages against employers who engage in retaliatory conduct. The District Court concluded, and respondent now argues, that this absence implies a congressional intent to bar a state action, like petitioner's, that permits such an award.

As the District Court put it, § 210 reflects "an informed judgment [by Congress] that in no circumstances should a nuclear whistler blower receive punitive damages when fired or discriminated against because of his or her safety complaints." 683 F. Supp., at 1014. We believe the District Court and respondent have read too much into Congress' decision not to authorize exemplary damages for most § 210 violations. First, even with respect to actions brought under § 210, the District Court was incorrect in stating that "in no circumstances" will a nuclear whistle-blower receive punitive damages; § 210(d) authorizes a district court to award exemplary damages in enforcement proceedings brought by the Secretary. Moreover, and more importantly, we think the District Court failed to follow this Court's teaching that "[o]rdinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law." *California* v. *ARC America Corp.*, 490 U. S. 93, 105 (1989). Absent some specific suggestion in the text or legislative history of § 210, which we are unable to find, we cannot conclude that Congress intended to pre-empt all state actions that permit the recovery of exemplary damages.

Finally, we address the District Court's holding that the expeditious timeframes provided by Congress for the processing of § 210 claims reflect a congressional decision that no whistle-blower should be able to recover under any other law after the time for filing under § 210 has expired. The District Court reasoned, and respondent agrees, that if a state-law remedy is available after the time for filing a § 210 complaint has run, a whistle-blower will have less incentive to bring a § 210 complaint. As a result, the argument runs, federal regulatory agencies will remain unaware of some safety violations and retaliatory behavior and will thus be unable to ensure radiological safety at nuclear facilities. We cannot deny that there is some force to this argument, but we

do not believe that the problem is as great as respondent suggests.

First, many, if not most, retaliatory incidents come about as a response to safety complaints that employees register with federal regulatory agencies. The Federal Government thus is already aware of these safety violations, whether or not the employee invokes the remedial provisions of § 210. Also, we are not so sure as respondent seems to be that employees will forgo their § 210 options and rely solely on state remedies for retaliation. Such a prospect is simply too speculative a basis on which to rest a finding of pre-emption. The Court has observed repeatedly that pre-emption is ordinarily not to be implied absent an "actual conflict." See, *e. g.*, *Savage* v. *Jones*, 225 U. S. 501, 533 (1912). The "teaching of this Court's decisions . . . enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists." *Huron Portland Cement Co.* v. *Detroit*, 362 U. S. 440, 446 (1960).

## III

We conclude that petitioner's claim for intentional infliction of emotional distress does not fall within the pre-empted field of nuclear safety as that field has been defined in prior cases. Nor does it conflict with any particular aspect of § 210. The contrary judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*