PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-3878
_____

JOSEPH ELASSAAD,
                                        Appellant
v.

INDEPENDENCE AIR, INC.;
DELTA AIR LINES, INC.,

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 05-cv-02328)
District Judge:  Honorable Edmund V. Ludwig

_____

Argued January 28, 2010

Before: RENDELL and JORDAN, Circuit Judges,
and AMBROSE, District Judge*
(Filed: July 6, 2010)

<hr>

        *The Honorable Donetta W. Ambrose, Judge of the
United States District Court for the Western District of
Pennsylvania, sitting by designation.

Eugene F. Jarrell, III, Esq.   **[ARGUED]**
211 North Olive Street
Media, PA 19063
   *Counsel for Appellant*

Jonathan M. Stern, Esq.   **[ARGUED]**
Schnader Harrison Segal & Lewis LLP
750 9th Street, NW, Suite 550
Washington, DC 20006
   *Counsel for Appellee*
   *Independence Air Inc.*

———

AMENDED OPINION OF THE COURT

———

RENDELL, <u>Circuit Judge</u>.

Joseph Elassaad appeals from an order granting summary judgment in favor of Independence Air, Inc., with respect to his negligence claim for injuries sustained when he fell while disembarking from an airplane at the Philadelphia International Airport. His appeal requires us to consider the extent to which the Federal Aviation Act ("Aviation Act"), 49 U.S.C. § 40101 et seq., preempts state law concerning tort claims arising from an air carrier's conduct in overseeing the disembarkation of passengers. Although we stated in *Abdullah v. American Airlines, Inc.*, 181 F.3d 363, 365 (3d Cir. 1999), that the Aviation Act preempts "the entire field of aviation safety" from state regulation, we hold that the "field of aviation safety" does

2

not include a flight crew's oversight of the disembarkation of passengers once a plane has come to a complete stop at its destination. *Abdullah* therefore does not control the instant case. We also hold that the Aviation Act and the regulations promulgated thereunder do not preempt state tort law with respect to such negligence claims. Moreover, we conclude that the federally enacted Air Carrier Access Act ("ACAA"), 49 U.S.C. § 41705 et seq., and its implementing regulations do not control the standard of care from the standpoint of airline safety. As a result, we conclude that the standard of care in Elassaad's negligence claim is not preempted by federal law, and we will reverse the grant of summary judgment for Independence and remand for further proceedings.

## I. Background

Elassaad's right leg was amputated above the knee in 1978, and he relies on a pair of crutches to walk. On February 9, 2004, he boarded a Boston-to-Philadelphia flight operated by Independence under the auspices of Delta Air Lines. The flight was on a Dornier 328, a small commuter jet, which passengers boarded from the tarmac via a 3½-foot long flight of steps built into the door of the aircraft. After arriving at his seat without incident, Elassaad attempted to place his crutches in the overhead bin, which was not long enough to accommodate them. Adrien Lavoie, the lone flight attendant on the plane, then took the crutches and stowed them in the baggage area for the duration of the flight.

Upon landing in Philadelphia, Lavoie asked Elassaad to stay in his seat until the other passengers had deplaned. Lavoie

3

then returned the crutches to Elassaad, who used them to approach the aircraft door. At that point, despite having boarded the aircraft by the same staircase, Elassaad noticed for the first time that the stairs were narrow.[1] The staircase had a railing on the left side, but not on the right. Though Elassaad recognized that he "needed assistance" to descend the staircase, App. 117, he chose not to request help because he believed the only aid the airline could offer would be to carry him down the stairs. Elassaad testified that he would have declined such assistance due to his perception of it as demeaning.[2] However, he would

---

[1] At his deposition, Elassaad estimated that the steps were between eleven and thirteen inches wide, and he explained that he had not previously taken note of their narrowness because descending stairs using crutches is more difficult than ascending them. He stated that he was apprehensive of falling because the stairs were narrow and he sometimes has difficulty maintaining his balance on tight staircases.

[2] According to the relevant ACAA-implementing regulation, airline personnel would not have been permitted to carry Elassaad down the stairs unless there was an emergency. *See* 14 C.F.R. § 382.39(a)(2) (2004). The Department of Transportation revised the regulations implementing the ACAA on May 13, 2008, after Elassaad's accident. *See* Nondiscrimination on the Basis of Disability in Air Travel, 73 Fed. Reg. 27,614 (May 13, 2008). All references to and quotations of those regulations in the body of this opinion are based on the pre-amendment text, which was in effect at all
(continued...)

4

have accepted the assistance of a wheelchair or an electronic lift had he known that this type of assistance was available to him.[3]

As Elassaad began to descend the stairs, he lost his balance and fell off the right side of the staircase, striking his shoulder on the pavement. According to his complaint, this resulted in severe injuries, including torn cartilage in his shoulder that required surgical repair.

Elassaad commenced this lawsuit in the Court of Common Pleas of Philadelphia County, Pennsylvania, advancing three separate negligence claims under Pennsylvania law against Independence and Delta: that the airlines were negligent in (1) operating an aircraft made defective by design features of the aircraft steps; (2) failing to inspect and maintain the steps; and (3) failing to offer and render personal assistance to Elassaad as he disembarked from the jet. The case was removed to the United States District Court for the Eastern District of Pennsylvania on May 18, 2005, based on diversity of citizenship. Shortly thereafter, on June 14, 2005, Elassaad

---

[2](...continued)
times relevant to this case. The current prohibition on carrying a passenger appears at 14 C.F.R. § 382.101 (2009).

[3] During his deposition, Lavoie stated that he had told Elassaad about the availability of a wheelchair (though Elassaad denies this), but not about the availability of an electronic lift or a "straight back." A "straight back" is similar in form to a hand truck.

5

voluntarily dismissed Delta from the suit. Independence then moved for partial summary judgment with respect to the first claim. The District Court granted Independence's motion as unopposed. By that time, Elassaad had withdrawn his second claim, which was based on Independence's alleged failure to inspect and maintain the steps, leaving, in the words of the District Court, "the sole liability issue [as] whether [Independence] negligently failed to assist [Elassaad] in disembarking the airplane, including, without limitations, making available all appropriate safety measures and devices." App. 3.

Independence moved for summary judgment on Elassaad's remaining claim, arguing that the controlling standard of care, dictated by federal law, obligates an airline to provide assistance only upon request, and that it is undisputed that Elassaad did not ask for assistance. Specifically, Independence argued that the regulations implementing the ACAA,[4] which address air carriers' conduct toward the disabled, *see* 14 C.F.R. §§ 382.1–.70 (2004), preempt state law negligence standards. The ACAA regulations require air carriers to "provide assistance requested by or on behalf of qualified individuals with a disability, or offered by air carrier personnel and accepted by qualified individuals with a disability, in enplaning and deplaning." 14 C.F.R. § 382.39(a)

---

[4] When referring to the ACAA-implementing regulations hereafter, we will simply say "the ACAA regulations."

6

(2004).[5] Neither the ACAA nor its regulations expressly require air carriers to offer assistance, and Elassaad made no such request for assistance. Nor do the ACAA regulations obligate carriers to inform a disabled passenger of available assistive measures unless the passenger states the need for a wheelchair. *See* 14 C.F.R. § 382.45(a)(2) (2004).[6]

Elassaad responded to Independence's motion for summary judgment by asserting that the ACAA and its regulations were intended only to prevent discrimination against disabled passengers, not to establish standards for the safe operation of an aircraft. He argued that air carriers could be held liable for failing to affirmatively offer assistance to disabled passengers, notwithstanding the ACAA, if that failure compromised passenger safety. Elassaad noted that the Federal Aviation Administration ("FAA"), which has the authority to establish air safety standards, has not promulgated any safety regulations describing what, if any, assistance air carriers must offer passengers when deplaning. In the absence of a controlling federal safety regulation, Elassaad argued, state negligence law governs an air carrier's duty of care in that situation, and the failure of Independence to offer him aid

---

[5] The provisions of § 382.39(a) that are pertinent to this case currently appear in 14 C.F.R. § 382.95(a) (2009), and impose requirements that are substantively identical to the former § 382.39(a).

[6] That obligation currently appears in 14 C.F.R. § 382.41(c) (2009).

7

constituted negligence under Pennsylvania common law. Alternatively, Elassaad argued that, if the Aviation Act does control, the general standard of care set forth in 14 C.F.R. § 91.13, which prohibits carriers from operating an aircraft in a "careless or reckless manner," imposed a duty of care on Independence to offer him deplaning assistance and that the airline consequently breached that duty when it failed to offer him such assistance.

The District Court concluded that, under our holding in *Abdullah*, federal law dictated the standard of care for Elassaad's negligence suit. The District Court adopted Independence's view of the applicable standard of care, as found in the ACAA regulations. The District Court concluded that the ACAA and its regulations impose no affirmative duty to offer assistance to a disabled airline passenger, and that, even if the standard under 14 C.F.R. § 91.13 applied, Elassaad had failed to "point[] to caselaw or expert testimony to establish that the failure of Independence to offer assistance to [Elassaad] constituted careless or reckless conduct." App. 6-7. The District Court granted Independence's motion for summary judgment, and Elassaad filed a timely appeal.

II. Jurisdiction and Standard of Review

Independence removed the present action to federal court under 28 U.S.C. § 1441. The District Court exercised diversity jurisdiction under 28 U.S.C. § 1332. Our jurisdiction arises under 28 U.S.C. § 1291. We review de novo district court orders granting or denying summary judgment. *See Levy v. Sterling Holding Co.*, 544 F.3d 493, 501 (3d Cir. 2008). We

8

also exercise de novo review of a preemption determination, as it is a question of law. *See Horn v. Thoratec Corp.*, 376 F.3d 163, 166 (3d Cir. 2004).

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Because summary judgment was entered against Elassaad, we view any disputed facts in his favor. *See Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir. 1995).

## III. Discussion

On appeal, Elassaad challenges the District Court's determination that the ACAA and its implementing regulations preempt state negligence law with respect to an air carrier's duty to offer aid to disabled passengers when deplaning. Elassaad asserts that state negligence law governs an air carrier's duty of care under such circumstances, or in the alternative, that if our holding in *Abdullah* dictates that there is federal preemption, then the standard of care is the "careless or reckless" standard established by 14 C.F.R. § 91.13.

Independence argues that whether or not *Abdullah* applies, the ACAA and its implementing regulations "preempt state law on air carrier interaction with passengers with a disability." Appellee's Br. at 7. Independence alternatively urges that *Abdullah* "remains good law, extends to boarding and disembarking, and applies in this case," but that the level of care

provided was above the "careless or reckless" standard imposed by § 91.13. *Id.* at 5.

We agree with Elassaad's main contention, namely, that his common law negligence claim is not preempted by federal law. We will explain our reasoning by addressing each of the arguments made by Independence on appeal. To do this, we will begin by discussing our decision in *Abdullah*, the scope of its holding, and why the instant case does not fall within that scope. Then we will discuss why the Aviation Act and the ACAA, and the regulations implementing those statutes, do not preempt the state law standard of care in this case. These are issues of first impression in our court, as we have not previously considered the intersection of the Aviation Act safety regulations and the ACAA regulations, or their proper applications in this context.

A.

In *Abdullah*, passengers aboard an American Airlines flight were injured as a result of severe turbulence en route from New York to Puerto Rico. 181 F.3d at 365. The passengers initiated two separate lawsuits in the District Court of the Virgin Islands against American Airlines, which were consolidated for trial. *Id.* The passengers claimed that the flight crew was negligent as a matter of Virgin Islands law both in failing to take reasonable precautions to avoid, and in failing to warn the passengers about, the turbulence. *Id.* After a jury in Saint Croix returned a verdict in favor of the passengers, the trial court granted American Airlines' motion for a new trial, on the ground that the court had improperly instructed the jury on the

local standard of care rather than on the standard prescribed by the Aviation Act. *Id.* at 366.

At the passengers' request, the trial court then certified a two-part question for appeal: "Does federal law preempt the standards for air safety, but preserve State and Territorial damage remedies?" *Id.* at 364. We granted interlocutory review, and answered both parts of the question in the affirmative. We held that there was "implied preemption of the entire field of aviation safety," but that "despite federal preemption of the standards of care, state and territorial damage remedies still exist for violation of those standards." *Id.* at 365.

*Abdullah*'s holding was grounded in our finding that Congress, by enacting the Aviation Act, intended "'to promote safety in aviation and thereby protect the lives of persons who travel on board aircraft'" by resting "sole responsibility for supervising the aviation industry with the federal government." *Id.* at 368 (citation omitted). This conclusion as to congressional intent was primarily supported by the Aviation Act's legislative history and its judicial interpretation in *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624 (1973). We noted that the Supreme Court in *City of Burbank* had analyzed the Aviation Act's legislative history to reach the conclusion that "Congress's consolidation of control of aviation in one agency indicated its intent to federally preempt aviation safety." *Abdullah*, 181 F.3d at 369 (citing *City of Burbank*, 411 U.S. at 639).

In *Abdullah*, we specifically found that Congress intended the Administrator of the FAA to exercise "sole

11

discretion in regulating air safety" by vesting the Administrator with broad regulatory authority. *Id.* We stated that, to effectuate this authority, the Administrator "has implemented a comprehensive system of rules and regulations" to promote flight safety. *Id.* Based on the comprehensive regulatory system, we determined that federal law so thoroughly occupies the legislative field of aviation safety that federal law impliedly preempts state regulation in that area. *Id.* at 371. Our finding of field preemption notwithstanding, we held that state common law remedies were still available to the injured passengers based on the specific language of the Aviation Act's savings and insurance clauses. *Id.* at 375-76. We remanded proceedings to the trial court to determine whether the jury instructions based on Virgin Islands law nevertheless comported with the federal standard of care. *Id.* at 376.

We did not conclude in *Abdullah* that the passengers' common law negligence claims themselves were preempted; instead, we determined only that the standard of care used in adjudicating those claims was preempted. Local law still governed the other negligence elements (breach, causation, and damages), as well as the choice and availability of remedies. This was consistent with our prior observation, in the context of airline deregulation, that "[i]t is highly unlikely that Congress intended to deprive passengers of their common law rights to recover for death or personal injuries sustained in air crashes." *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 194 (3d Cir. 1998).

Again, *Abdullah*'s primary holding was that federal law preempted "the entire field of aviation safety." 181 F.3d at 365.

12

Of critical import here is the fact that precedent is controlling only as far as it goes. Because the parties debate whether and when *Abdullah* applies, we will provide clarification on that issue.

B.

Courts have recognized three species of preemption: express preemption, conflict preemption, and field preemption. Express preemption requires that Congress's intent to preempt be "'explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (citation omitted). Conflict preemption occurs when state law "actually conflicts with federal law," such that "it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (internal quotation marks and citations omitted). Field preemption occurs when a field is "reserved for federal regulation, leaving no room for state regulation," and "congressional intent to supersede state laws [is] clear and manifest." *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 336 (3d Cir. 2009) (internal quotation marks and citations omitted). Both statutes and regulations can preempt state law. *Id.* at 339.

C.

There is no basis for finding that the Aviation Act preempts Elassaad's state law claims through express

13

preemption or conflict preemption. To the extent that the Aviation Act preempts these claims, it must be through field preemption.

In *Abdullah*, we found that there was implied field preemption "of the entire field of aviation safety" as a result of the Aviation Act and its implementing regulations. 181 F.3d at 365. However, our analysis of field preemption in *Abdullah*—specifically, the "field" of "aviation safety"—was in the context of in-flight safety. This is clear from a careful reading of our decision. In describing our conclusion regarding preemption, we stated that "federal law establishes the applicable standards of care in the field of *air safety*," and that the FAA has "sole discretion in regulating *air safety*." *Id.* at 367, 369 (emphases added). As examples of what we meant by the term "air safety," we noted that a goal of the Aviation Act was to reduce "accidents in air transportation," *id.* at 369 (quoting 49 U.S.C. § 44701(c)); we referred to the FAA's regulation of "pilot certification, pilot pre-flight duties, pilot flight responsibilities, and flight rules," *id.* at 369 (footnotes omitted); and we described case law regarding issues "such as airspace management, flight operations, and aviation noise," *id.* at 371. Accordingly, we identified the standard of care applicable in *Abdullah* as that supplied by 14 C.F.R. § 91.13(a), which states, with respect to "*[a]ircraft operations for the purpose of air navigation*," that "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." 14 C.F.R. § 91.13(a); *see* 181 F.3d at 372. This is, of course, consistent with the facts of *Abdullah*, in which plaintiffs brought suit based on injuries sustained while

14

the aircraft was in the air, transporting passengers from New York to Puerto Rico. 181 F.3d at 366.

Our discussion of the regulatory framework giving rise to preemption in *Abdullah* focused exclusively on safety while a plane is in the air, flying between its origin and destination. Our use of the term "aviation safety" in *Abdullah* to describe the field preempted by federal law was thus limited to in-air safety. The supervision of the disembarkation process by a flight crew therefore falls outside the bounds of what we were considering in *Abdullah*.[7]

As we have not opined as to the preemptive effect of federal law in this context, we must do so here. Accordingly, we will consider an issue presented to us for the first time: whether the Aviation Act, the ACAA, and their implementing regulations preempt state tort law with respect to accidents that occur when a passenger is disembarking a plane.

## D.

When considering preemption of an area of traditional state regulation, we "begin our analysis by applying a presumption against preemption." *Holk*, 575 F.3d at 334

---

[7] The parties argue at length about whether our holding in *Abdullah* survives the Supreme Court's decision in *Wyeth v. Levine*, 129 S. Ct. 1187 (2009). Because *Abdullah* does not apply to the facts of this case, we make no comment regarding what effect, if any, *Wyeth* has on *Abdullah*'s continued vitality.

15

(citations omitted).[8] It is beyond dispute that it has traditionally been the province of state law to govern disputes in cases where a plaintiff alleges that he fell as a result of the defendant's negligence. Moreover, as we recognized in *Taj Mahal, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186 (3d Cir. 1998), it is appropriate to use a restrained approach in recognizing the preemption of common law torts in the field of aviation. Although *Taj Mahal* focused on the impact of the Airline Deregulation Act, we reasoned that preemption of tort law in aviation should be constrained in part because "the Department of Transportation has neither the authority nor the apparatus required to superintend" tort disputes. 164 F.3d at 194.

In addition, as Justice Stevens has stated, "'Congress did not intend to give airlines free rein to commit negligent acts subject only to the supervision of the Department of Transportation, any more than it meant to allow airlines to breach contracts with impunity," because "the standard of ordinary care, like contract principles, 'is a general background rule against which all individuals order their affairs.'" *Id.* at 192 (quoting *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 236-37 (1995) (Stevens, J., concurring in part and dissenting in part)). Even though *Taj Mahal* addressed a different statute than the

_____

[8] As the Supreme Court has recently stated, a cornerstone of its preemption jurisprudence is "the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth*, 129 S. Ct. at 1194-95 (internal quotation marks and citation omitted).

16

federal laws at issue in this case, we adhere to its conservative approach today.

As noted above, to find field preemption, we must find that federal law "leav[es] no room for state regulation" and that Congress had a "clear and manifest" intent to supersede state law. *Holk*, 575 F.3d at 336 (internal quotation marks and citations omitted). In undertaking this inquiry, we consider the language and goals of the applicable statute and regulations, as well as any explicit statements by Congress or an agency regarding preemption. *Id.* at 336-39.

When the Aviation Act was enacted in 1958, it, among other things, created the FAA, gave the government authority to review airfares, instituted a system for registering and certifying aircraft, and set safety standards for air carriers and aircraft. *See* Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731. Only the portions of the Aviation Act relating to safety are relevant here. In their current form, the statute's safety-related provisions set forth standards for certifying pilots, flight attendants, air carriers, airports, and other facilities, *see* 49 U.S.C. §§ 44702-44711, 44728, and require the FAA to regulate such issues as collision avoidance systems, aircraft inspections, and "aircraft operations during winter conditions," *see* §§ 44713, 44716, 44717, 44722. The statute also directs the FAA to issue regulations in keeping with two safety-related goals: the "reduc[tion] or eliminat[ion] [of] the possibility or recurrence of accidents in air transportation," and the "promot[ion] [of] safe flight of civil aircraft," such as by prescribing standards for the construction and maintenance of aircraft, "the reserve supply of fuel and oil carried in flight," and

17

"the maximum hours or periods of service of airmen and other employees of air carriers." § 44701(c), (a). Nothing in the statute pertains to safety during disembarkation; rather, the statute's safety provisions appear to be principally concerned with safety in connection with operations associated with flight. Indeed, as we noted in *Abdullah*, Congress enacted the Aviation Act to "protect the lives of persons who travel on board aircraft." 181 F.3d at 368 (internal quotation marks and citation omitted).

It is not surprising, then, that most of the regulations adopted pursuant to the Aviation Act concern aspects of safety that are associated with flight. For example, the regulations detail certification and "airworthiness" requirements for aircraft parts.[9] They include flight rules familiar to air travelers, such as those requiring the use of seatbelts, restricting the use of electronic devices, regulating where carry-on baggage can be stored, and requiring the stowage of food and beverage equipment during taxiing, takeoff, and landing.[10] They also set

---

[9] *See, e.g.*, 14 C.F.R. § 21.127(a) ("Each person manufacturing aircraft . . . shall establish an approved production flight test procedure and . . . flight test each aircraft produced."); 14 C.F.R. §§ 23.21-.29 (governing weight limits within which aircraft may be safely operated); 14 C.F.R. § 23.51 (governing takeoff speeds).

[10] *See* 14 C.F.R. § 91.107 (seatbelts); 14 C.F.R. §§ 91.21 and 135.144 (electronic devices); 14 C.F.R. §§ 91.523, .525 (carry-

(continued...)

18

qualifications for pilots, flight attendants, and air traffic control operators,[11] and regulate the conduct of crew members during flight.[12]  Similarly, the regulations impose restrictions on an

_____

[10](...continued)
on baggage); 14 C.F.R. § 91.535 (food and beverage equipment).

[11] *See, e.g.*, 14 C.F.R. § 61.159 ("[A] person who is applying for an airline transport pilot certificate with an airplane category and class rating must have at least 1,500 hours of total time as a pilot . . . ."); 14 C.F.R. § 65.33 (governing general eligibility requirements for air traffic controllers); 14 C.F.R. § 91.533(b) ("No person may serve as a flight attendant on an airplane . . . unless that person has demonstrated to the pilot in command familiarity with the necessary functions to be performed in an emergency or a situation requiring emergency evacuation and is capable of using the emergency equipment installed on that airplane.").

[12] *See, e.g.*, 14 C.F.R. § 91.15 ("No pilot in command of a civil aircraft may allow any object to be dropped from that aircraft in flight that creates a hazard to persons or property."); 14 C.F.R. § 91.17(a)(2) ("No person may act or attempt to act as a crewmember of a civil aircraft—While under the influence of alcohol . . . ."); 14 C.F.R. § 135.100(b) ("No flight crewmember may engage in, nor may any pilot in command permit, any activity during a critical phase of flight which could distract any flight crewmember from the performance of his or her duties or

(continued...)

aircraft's speed, altitude, communications, and flight path.[13] We note that the regulations under the Aviation Act do not specifically regulate the conduct of the crew in connection with the loading or unloading of passengers. The primary purpose of these regulations appears to be the prevention of accidents, and the assurance of passenger safety, in connection with flight.

The regulations also contain a broader standard in 14 C.F.R. § 91.13, which we identified in *Abdullah* as "provid[ing] a general description of the standard required for the safe operation of aircraft" even "where there is no specific provision or regulation governing air safety." 181 F.3d at 371. That regulation contains two paragraphs. Section 91.13(a) applies when an aircraft is being operated "for the purpose of air navigation"; section 91.13(b) applies when an aircraft is being operated "other than for the purpose of air navigation."

_____

[12](...continued)
which could interfere in any way with the proper conduct of those duties.").

[13] *See, e.g.*, 14 C.F.R. § 91.117(a) ("[N]o person may operate an aircraft . . . at an indicated airspeed of more than 250 knots (288 m.p.h.)."); 14 C.F.R. § 91.119 (setting minimum altitudes for various situations); 14 C.F.R. §§ 91.126, .127, .129, .130, .131, and .135 (prescribing requirements for communications with air traffic control towers); 14 C.F.R. § 91.145 (describing temporary flight restrictions that may be imposed "to prevent the unsafe congestion of aircraft in the vicinity of an aerial demonstration or major sporting event").

Section 91.13(a) provides as follows: *"Aircraft operations for the purpose of air navigation.* No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." Independence contends that the aircraft was being "operat[ed] for the purpose of air navigation" within the meaning of this regulation. We are not so sure.

In order to interpret the phrase "operations for the purpose of air navigation" as used by § 91.13(a), we begin by considering the definitions provided by the regulations themselves. The general definitions section of the regulations defines "operate" to mean "use, cause to use or authorize to use aircraft, for the purpose (except as provided in [§ 91.13]) of air navigation including the piloting of aircraft, with or without the right of legal control (as owner, lessee, or otherwise)." 14 C.F.R. § 1.1. As that definition indicates, the meaning of "operate" is derived in part from § 91.13. Since § 91.13(a), like the general definition of "operate," refers to "operations for the purpose of air navigation," the reference to § 91.13 appears to mean § 91.13(b), which we will discuss below.

The definitions provided by the Aviation Act also help to elucidate the meaning of § 91.13(a). The statute defines "'operate aircraft' and 'operation of aircraft' [to] mean using aircraft for the purposes of air navigation, including—(A) the navigation of aircraft; and (B) causing or authorizing the operation of aircraft with or without the right of legal control of the aircraft." 49 U.S.C. § 40102(a)(35). Although the statute does not define "air navigation," it does define two related terms: "navigate aircraft" and "air navigation facility."

21

"'[N]avigate aircraft' and 'navigation of aircraft' include piloting aircraft." § 40102(a)(33). "'[A]ir navigation facility'. . . includ[es]—(A) a landing area; (B) a light; (C) apparatus or equipment for distributing weather information, signaling, radio-directional finding, or radio or other electromagnetic communication; and (D) another structure or mechanism for guiding or controlling flight in the air or the landing and takeoff of aircraft." § 40102(a)(4).

In light of these definitions, we conclude that the aircraft was not being operated for the purpose of air navigation at the time of Elassaad's accident, and thus that the standard of care provided by § 91.13(a) did not apply to this situation. By the time of the accident, the aircraft had landed, taxied to the gate, and come to a complete stop; the crew had already opened the door and lowered the plane's stairs; and all of the passengers other than Elassaad had deplaned. As discussed above, the statutory and regulatory definitions of "operate" state that a plane is only being operated, within the meaning of § 91.13(a), when it is being "use[d]" for "navigation," and the Aviation Act's definitions of "navigate aircraft" and "air navigation facility" demonstrate that the term "navigation" principally applies to the takeoff and landing of an aircraft, and the "piloting" that occurs during the flight. These definitions contemplate a flight crew's interaction with an aircraft and with passengers who are on the aircraft. By contrast, we conclude that a flight crew's oversight of the disembarkation of passengers—after a plane has finished taxiing to the gate, and its

22

crew has opened the aircraft's door and lowered its stairs—does not constitute "operations for the purpose of air navigation."[14]

We also conclude that the aircraft was not being operated "other than for the purpose of air navigation" as envisioned by 14 C.F.R. § 91.13(b). Both parties concede this, and we agree. That portion of the regulation provides as follows:

> *Aircraft operations other than for the purpose of air navigation.* No person may operate an aircraft, other than for the purpose of air navigation, on any part of the surface of an airport used by aircraft for air commerce (including areas used by those aircraft for receiving or discharging persons or cargo), in a careless or reckless manner so as to endanger the life or property of another.

§ 91.13(b). The comments made by the FAA in conjunction

---

[14] We do not reach the issue of whether other activities that occur while a plane is on the ground, such as taxiing or the process of opening an aircraft's doors, would constitute "operations" such that they would be subject to federal preemption.

23

with the issuance of this regulation[15] help to clarify its meaning. The agency explained that the term "'operate an aircraft other than for the purpose of air navigation' . . . is employed in this rule in order to clearly limit the applicability of the rule to *those acts which impart some physical movement to the aircraft, or involve the manipulation of the controls of the aircraft* such as starting or running an aircraft engine." Careless or Reckless Ground Operation of Aircraft, 32 Fed. Reg. 9640, 9640-41 (July 4, 1967) (emphasis added). There is no evidence that, by watching Elassaad exit the plane, the flight crew was engaging in any acts that "impart[ed] some physical movement to the aircraft, or involve[d] the manipulation of the controls of the aircraft." *Id.* As noted above, not only had the aircraft come to a complete stop, but the aircraft's door had been opened, its stairs had been lowered, and most of the passengers had already disembarked. The crew's conduct with respect to Elassaad's disembarkation therefore did not constitute "operations" for any purpose under § 91.13.

The statutory and regulatory framework of the Aviation Act thus provides no evidence of any intent—much less a "clear and manifest" intent—to regulate safety during disembarkation. In *Abdullah*, we concluded that, given the overwhelming number of relevant Aviation Act safety regulations, the Aviation Act preempted the field of aviation safety. Here, there is no

---

[15] At the time, § 91.13(b) was known as 14 C.F.R. § 91.10. The regulation was later renumbered, without any textual revisions, in 1989. *See* Revision of General Operating and Flight Rules, 54 Fed. Reg. 34,284, 34,289 (Aug. 18, 1989).

indication that either Congress or the FAA intended that federal law would impose a legal duty in an area that is neither specifically regulated by federal law nor clearly governed by a general federal standard of care: the assistance provided to passengers during their disembarkation. Accordingly, we conclude that the Aviation Act and its safety regulations do not preempt state law standards of care in this negligence action.

E.

After the District Court found federal preemption based on *Abdullah*, it looked to the ACAA regulations for the applicable standard of care. On appeal, Independence goes further than the District Court, and argues that, as a matter of both field preemption and conflict preemption, the ACAA independently preempts Elassaad's negligence claim. We reject these arguments.

Congress passed the ACAA in 1986 as an amendment to the Aviation Act. *See* Pub. L. No. 99-435 § 2(a), 100 Stat. 1080 (1986). The statute was intended to close a gap in anti-discrimination law that was made apparent by the Supreme Court's decision in *Department of Transportation v. Paralyzed Veterans of America*, 477 U.S. 597, 610-12 (1986), in which the Court held that, despite receiving federal funding, air carriers were not subject to certain provisions of the Rehabilitation Act, 29 U.S.C. § 794. The ACAA was designed to address and prohibit airline discrimination based on disabilities, and directed the FAA to issue regulations "to ensure nondiscriminatory treatment of qualified handicapped individuals consistent with safe carriage of all passengers on air carriers." § 3, 100 Stat. at

25

1080; *see also* 49 U.S.C. § 41705(a).  More than just prohibiting overtly discriminatory conduct, these regulations "are aimed at ensuring that services, facilities, and other accommodations are provided to passengers with disabilities in a respectful and helpful manner."  Nondiscrimination on the Basis of Disability in Air Travel, 70 Fed. Reg. 41,482, 41,504 (July 19, 2005).[16] Despite the statute's reference to the "safe carriage of all passengers," the ACAA regulations do not displace Aviation Act safety regulations.  *See* 14 C.F.R. § 382.3(d) (2004) ("Nothing in this part shall authorize or require a carrier to fail to comply with any applicable FAA safety regulation.").[17]

_____

[16] The FAA goes so far as to advise air carriers on the proper content of, and tone used in, communications with disabled passengers.  *See* 70 Fed. Reg. 41,504 ("Emotions matter . . . . When acknowledging the emotions of others, it may be more effective to use 'you' rather than 'I.'  For example, use, 'You must be frustrated by having to wait for your checked wheelchair.'  Not, 'I completely understand how you feel, I had to wait forever at a supermarket check-out yesterday.'"); *id.* ("If you have any doubts as to how to assist a passenger with a disability, you should ask the passenger for guidance before acting.  Avoid being overly enthusiastic about helping and always think before you speak and act when offering assistance.").

[17] The directive of section 382.3(d) was replaced with similar language that now appears in 14 C.F.R. § 382.7(g) (2009): "Notwithstanding any provisions of this Part, you must comply
(continued...)

It is clear that the ACAA is aimed at ensuring respect and equal treatment for disabled airline passengers. But Elassaad did not claim that Independence violated any of its obligations under the ACAA,[18] nor did he even suggest that discrimination played any role in its conduct toward him. Instead, Elassaad alleged in his complaint that Independence was negligent, inter alia, in failing to provide both "a means for Plaintiff to safely exit the plane given his physical condition and need to use crutches" and "personal assistance to help Plaintiff go down the steps." App. 16-17. Independence contends that these claims are preempted by the ACAA.

---

[17](...continued)
with all FAA safety regulations . . . ."

[18] Even if Elassaad were alleging discriminatory treatment, it is not clear whether he would have a right of action under the ACAA. *Compare Shinault v. Am. Airlines*, 936 F.2d 796, 800 (5th Cir. 1991) (holding that the ACAA creates a private cause of action), *and Tallarico v. Trans World Airlines, Inc.*, 881 F.2d 566, 570 (8th Cir. 1989) (same), *with Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1266 (10th Cir. 2004) (holding that the ACAA does not create a private cause of action), *and Love v. Delta Air Lines*, 310 F.3d 1347, 1356 (11th Cir. 2002) (same). *See also Tunison v. Continental Airlines Corp.*, 162 F.3d 1187, 1188 n.1 (D.C. Cir. 1998) (expressly reserving decision on the question); *Bower v. Fed. Express Corp.*, 96 F.3d 200, 204 n.9 (6th Cir. 1996) (same). However, we need not resolve this issue today.

In light of the purposes of the ACAA and its implementing regulations, we are not persuaded that they preempt state law through either field preemption or conflict preemption. Independence contends that the ACAA preempts the field of "air carrier interaction with disabled persons." Appellee's Br. at 16. However, the ACAA is clearly directed at nondiscrimination, and we are not persuaded that Congress intended the ACAA to preempt *any* state regulation of the interaction between an air carrier and disabled passengers (or disabled persons in general). At most, the ACAA might preempt state nondiscrimination laws as they apply to discrimination by air carriers against disabled passengers. *See* Nondiscrimination on the Basis of Handicap in Air Travel, 55 Fed. Reg. 8008, 8014 (Mar. 6, 1990) ("[The ACAA] is a detailed, comprehensive, national regulation, based on Federal statute, that substantially, if not completely, *occupies the field of nondiscrimination on the basis of handicap in air travel . . . .* [I]nterested parties should be on notice that there is a strong likelihood that state action on matters covered by this rule will be regarded as preempted." (emphasis added)). State nondiscrimination laws, however, are not at issue in this case. We can find no evidence of a "clear and manifest" congressional intent to supersede any relevant state tort law or to "leav[e] no room for state regulation" in this area, and we thus cannot conclude that field preemption applies here. *Holk*, 575 F.3d at 336.

Nor do we believe that there is conflict preemption here. When conflict preemption applies, it is because state and federal requirements are diametrically opposed so as to frustrate each others' goals. In *Fidelity Federal Savings and Loan*, for

28

instance, a federal regulation allowed savings and loans to enforce "due-on-sale" clauses, but state law prohibited enforcement of such clauses. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 155 (1982). In *Geier*, a federal regulation sought a "variety and mix" of safety devices in cars, but a state law required the use of just one safety device. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000). In *Umland*, there was a "comprehensive administrative scheme" under federal law for employees to challenge their classifications as independent contractors, but this scheme would have been undermined by a state law cause of action based on the same claim. *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64-65 (3d Cir. 2008).

The present case is quite different. The ACAA was intended to ensure nondiscriminatory treatment of airline passengers. If it is true, as Elassaad contends, that the standard of care supplied by state law required Independence to assist him with his disembarkation and to provide a means for him to safely exit the aircraft,[19] those duties could easily coexist with the ACAA's mandate that Independence not discriminate against him. Independence urges that a goal of the ACAA was to protect "the dignity of disabled passengers," and that this objective would be frustrated by the state law duties cited by

---

[19] We do not understand Elassaad to be arguing that state law requires that air carriers offer assistance to *every* disabled passenger regardless of the circumstances, and we thus decline to address the "hypothetical state law" to this effect that is posited by Independence. *See* Appellee's Br. at 13.

29

Elassaad. Appellee's Br. at 12. Independence relies on three sources of authority for this argument: Department of Transportation guidance stating that carriers should "[o]ffer assistance only if the passenger appears to need help" (in order to "ensur[e] that services . . . are provided . . . in a respectful and helpful manner"), 70 Fed. Reg. at 41,504; a regulation prohibiting carriers from "[r]equir[ing] an individual with a disability to accept special services . . . not requested by the passenger," 14 C.F.R. § 382.7(a)(2) (2004); and a regulation requiring carriers to "provide assistance requested by or on behalf of qualified individuals with a disability, or offered by air carrier personnel and accepted by qualified individuals with a disability, in enplaning and deplaning," 14 C.F.R. § 382.39(a) (2004). These authorities, respectively, encourage carriers not to offer assistance when it is obvious that none is required; forbid carriers to insist that disabled passengers accept unwanted assistance; and require carriers to assist passengers who do request or accept such assistance. These mandates do not prohibit air carriers from offering unsolicited assistance to disabled passengers when the situation warrants it, and they do not evince a congressional intent that air carriers should withhold assistance from disabled passengers when doing so would be negligent or reckless under state law. In any event, we are not persuaded that compliance with duties imposed by state law would require air carriers to act in a manner that would undermine the dignity of disabled passengers. Thus, there is no basis for us to find either that it would have been "impossible" for Independence to comply with both state law and the ACAA, or that state law would have been an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English*, 496 U.S. at 79 (internal

30

quotation marks and citations omitted).[20]


## IV.  Conclusion

For the reasons given above, we conclude that Elassaad's case is governed by state law negligence principles and, since the District Court measured Elassaad's claim according to a different standard, we will vacate the District Court's order and remand for further proceedings consistent with this opinion.

---

[20] Although we conclude that the ACAA does not provide an applicable, controlling standard of care here, we offer one caveat:  the ACAA regulations cited by the District Court are not entirely irrelevant.  If this case goes to a jury, the jury will most likely be instructed as to the relevant regulations and told it can take them into consideration in assessing whether Independence and its crew fulfilled their duty toward Elassaad as he disembarked.  For example, the model jury instructions in Pennsylvania state that "[n]egligent conduct may consist either of an act or a failure to act when there is a duty to do so." *Pennsylvania Suggested Standard Civil Jury Instructions* § 3.01 (3d ed. 2005).  To the extent that the ACAA regulations set forth an aspect of the duty owed to Elassaad as a disabled person, it would be appropriate for the jury to consider them.