# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-SA-00110-SCT

*ANDY BARLOW, D.C.*

*v.*

*MISSISSIPPI STATE BOARD OF
CHIROPRACTIC EXAMINERS*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/20/2015 |
| TRIAL JUDGE: | HON. TOMIE T. GREEN |
| TRIAL COURT ATTORNEYS: | LEYSER Q. HAYES |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOHN H. OTT |
| | TODD BRENTLEY OTT |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LEYSER Q. HAYES |
| | WILLIAM JEFFREY JERNIGAN |
| | DAVID K. SCOTT |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 05/25/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., KING AND BEAM, JJ.**

**KING, JUSTICE, FOR THE COURT:**

¶1.     Dr. Andy Barlow was disciplined by the Mississippi State Board of Chiropractic

Examiners for advertising in violation of the statutes governing chiropractors.  Dr. Barlow

appealed to the circuit court, alleging that the statute governing chiropractic advertising had

been implicitly amended or repealed, that the statute governing chiropractic advertising

violated his First Amendment rights, and that the Board was without authority to assess the costs of the investigation to him. The circuit court affirmed the Board, and Dr. Barlow appealed to this Court, making the same arguments, as well as arguing that the circuit court erred by failing to afford him a "de novo appeal." Because Dr. Barlow's arguments on whether he should be disciplined lack merit, this Court affirms the judgments of the Board and circuit court on those issues. However, because the Board lacked authority to directly assess Dr. Barlow the costs of its investigation, this Court reverses the judgments of the circuit court and Board on the issue of costs and renders judgment for Dr. Barlow on that issue.

## FACTS AND PROCEDURAL HISTORY

¶2. Based upon two[1] patient complaints against Dr. Andy Barlow, D.C., the Mississippi State Board of Chiropractic Examiners brought a formal complaint against Dr. Barlow. The complaint charged Dr. Barlow with several violations,[2] including violations surrounding his advertising. The complaint alleged that Dr. Barlow advertised using professional designations other than "chiropractor," "doctor of chiropractic," "D.C.," or "chiropractic physician" in violation of Mississippi Code Sections 73-6-25(1)(a) and 73-6-19(1)(b).

¶3. At the hearing on the complaint, the advertisements, in which Dr. Barlow advertised

---

[1]One of those patients did not attend the hearing, and the Board thus did not address her complaints, and none are at issue in this appeal.

[2]The Board found that clear and convincing evidence was not established for any of the alleged violations, except for the advertising violations. The other violations are not at issue in this appeal.

as D.C., and also as DACNB,[3] FACFN,[4] and as a "Chiropractic Neurologist," were entered into evidence. Dr. Barlow and Dr. Patterson, the Board member assigned to investigate the complaint, both testified that Dr. Barlow's certifications in neurology required 1,600 hours of continuing education to achieve. Dr. Patterson testified that "[h]aving a chiropractic neurology degree would have – you would have a much better understanding of neurological issues that may be going in the body and be able to recognize other issues." The patient who made the complaint stated that she was confused by the advertisements as a "board certified chiropractic neurologist." She noted that the emphasis was on "neurologist" and that "chiropractic" seemed like a mere adjective.

¶4. On March 31, 2014, the Board issued its final order. The Board concluded that "[t]he clear and convincing evidence establishes cause to discipline the Respondent under Section 73-6-19(1)(b) for violations of Section 73-6-25(1)(a) by using professional designation in his printed advertisements other than the term 'chiropractor,' 'doctor of chiropractic,' 'D.C.,' or 'chiropractic physician.'" The Board ordered that "[a] monetary penalty is imposed upon the Respondent in the amount of Five Hundred Dollars ($500.00)." It also ordered that "[t]he Respondent shall pay to the Board the costs associated with its investigation and prosecution of this matter in the amount of $3216.00." On April 1, 2014, counsel for Dr. Barlow wrote the Board and asked the Board to provide him with the legal authority for the Board's assessment of investigative expenses, and also noted that the order contained no breakdown

[3]DANCB stands for "Diplomate of the American Chiropractic Neurology Board."

[4]FACFN stands for "Fellow of the American College of Functional Neurology."

3

of the costs assessed.  In an *undated* letter, the Board responded that in assessing the monetary penalty, the Board considers the cost of investigation.  It stated that Dr. Barlow committed at least five separate violations of Section 73-6-25(1).  It concluded that "[i]f this explanation is not satisfactory to you and Dr. Barlow, the Board can correct its Order to reflect the full monetary penalty authorized by Section 73-6-19."

¶5.     On April 24, 2014, Dr. Barlow appealed to the Hinds County Circuit Court.  After briefing on the issue, the circuit court entered an order affirming the decision of the Board in full.  It stated that "[i]t is not the position of this Court to act as a fact finder."  It continued that

> [i]n this case, the Board believed the facts conclusively proved the Appellant's discipline and subsequent monetary penalty was for good cause.  Having reviewed the record and being otherwise thoroughly advised in the premises, the Court finds that the Board followed the statute, and likewise opines that Appellant's disciplinary action was made in 'good faith for cause' and supported by substantial evidence.
>      IT IS, THEREFORE, ORDERED and ADJUDGED that there was substantial evidence before the Board to support its order and that the Board's order was not arbitrary and capricious, was not beyond the power of the administrative agency to make, nor did it violate some statutory or constitutional rights of the Appellant.

It consequently did not find error in the Board's actions.

¶6.     Dr. Barlow appeals to this Court, raising several issues: 1) whether the circuit court erred in failing to act as factfinder when Dr. Barlow was entitled to a "de novo appeal;" 2) whether Section 73-6-25(1)(a) was amended or repealed by implication by Section 41-121-1, *et seq.*; 3) whether Section 73-6-25(1)(a) impermissibly infringes on Dr. Barlow's First Amendment right to free speech; and 4) whether the Board's decision, particularly regarding

4

costs assessed, was unsupported by substantial evidence, was arbitrary and capricious, was beyond the scope or power granted the agency by the Legislature, and violated Barlow's statutory and constitutional rights.

## ANALYSIS

### 1. Standard of Review

¶7.    To be entitled to reversal of an agency decision, the aggrieved party must show that 1) the decision was not supported by substantial evidence, 2) the decision was arbitrary and capricious, 3) the decision was beyond the power of the administrative agency, or 4) the decision violated the party's statutory or constitutional rights.  *Equifax, Inc. v. Miss. Dep't of Revenue*, 125 So. 3d 36, 41 (Miss. 2013).  "This Court reviews questions of law de novo." *Id.*  We therefore review Dr. Barlow's first three issues de novo, and his fourth to determine whether the Board's decision was supported by substantial evidence, was arbitrary and capricious, was beyond the power of the agency, or violated Barlow's rights.

### 2. De Novo Appeal

¶8.    The statutory provision regarding appeal from a disciplinary decision of the Board provides that, within thirty days of the decision, the aggrieved party "shall have the right of a de novo appeal to the circuit court."  Miss. Code Ann. § 73-6-19(5) (Rev. 2012).  Dr. Barlow contends that this "de novo appeal" requires the circuit court to act as factfinder on the administrative record before it.

¶9.    In *Equifax*, this Court examined a statute that provided that the chancery court, in appeals from the Mississippi State Tax Commission, "shall try the case de novo and conduct

a full evidentiary judicial hearing on the issues raised." *Equifax*, 125 So. 3d at 41 (quoting

Miss. Code Ann. § 27-77-7(4) (2005)). The Court found that, even though the law said "de

novo," the

> petitioner must raise and prove one or more of the following: the agency's decision was unsupported by substantial evidence, the agency's decision was arbitrary and capricious, the agency's decision was beyond the power of the administrative agency to make, and/or the agency's decision violated the complaining party's statutory or constitutional right.

*Id.* Thus, the issues to be tried "de novo" under the statute are to be tried within the confines

of the deference given to agency decisions. The Court noted that confusion may stem from

the statute's instruction to "try the case de novo" because "de novo" means "anew," and

"anew" means a second time, afresh. *Id.* at 42. The Court explained that the court hearing

was actually the first hearing conducted before a judicial tribunal, thus "[i]n the absence of

a prior proceeding, no trial anew can occur." *Id.* "In the absence of a prior proceeding, no

trial anew can occur. Thus, the instruction to 'try the case de novo' is misdirected." *Id.*

¶10. This concept applies with even more force to Section 73-6-19(5). The original

(nonjudicial) proceeding was before the Board. The appeal from the Board to the circuit

court is the first appeal. Thus, there can be no appeal "anew" in the absence of a prior appeal

and the instruction that the petitioner has a right to a "de novo appeal" is misdirected. The

appeal is for the limited purpose of examining whether the Board's "decision was supported

by substantial evidence, was not arbitrary and capricious, was within the [Board's] power to

make, and did not violate [Dr. Barlow's] statutory and constitutional rights." *Id.* Thus,

because Dr. Barlow was not entitled to have the circuit court act as factfinder on the

6

administrative record before it, this issue is without merit.

### 3. The Effect of Section 41-121-1, et seq., on Section 73-6-25(1)(a)

¶11.    Section 73-6-25(1)(a) provides that "[t]he members of the chiropractic profession, licensed or unlicensed, are hereby prohibited from . . . use of any other professional designation other than the term 'chiropractor,' 'doctor of chiropractic,' 'D.C.' or 'chiropractic physician[.]'" Miss. Code Ann. § 73-6-25(1)(a) (Rev. 2012).

¶12.    In 2012, the Legislature passed "The Patient's Right to Informed Health Care Choices Act." Miss. Code Ann. § 41-121-1 (Rev. 2013). The Act states:

> The Legislature finds and declares that:
>
> (a) There are a multitude of professional degrees using the term "doctor," including Medical Doctor (M.D.); Doctor of Osteopathic Medicine (D.O.); Doctor of Dental Surgery (D.D.S.); Doctor of Podiatric Medicine (D.P.M.); Doctor of Optometry (O.D.); Doctor of Chiropractic (D.C.); Doctor of Nursing Practice (D.N.P.); Doctor of Pharmacy (Pharm.D.); and other designations which may be used by health care practitioners.
>
> (b) Choosing a health care provider is one of the most important decisions a patient makes, which should be supported by full disclosure from their health care provider. There are differences regarding the training and qualifications required to earn the professional degrees described in and subject to this chapter. These differences often concern the training and skills necessary to correctly detect, diagnose, prevent and treat serious health care conditions.
>
> (c) There is a compelling state interest in patients being promptly and clearly informed of the actual training and qualifications of their health care practitioners who provide health care services. This chapter aims to provide public protection against potentially misleading and deceptive health care advertising that cause patients to have undue expectations regarding their medical treatments and outcomes.

Miss. Code Ann. § 41-121-3 (Rev. 2013). The Act goes on to define the categories of health

7

care practitioners and includes "[p]ractitioners of chiropractic, signified by the letters 'D.C.' or the words chiropractor, doctor of chiropractic or chiropractic physician." Miss. Code Ann. § 41-121-5 (c)(v) (Rev. 2013). The Act requires that "[a]n advertisement for health care services that names a health care practitioner must identify the type of license held according to the definitions under this chapter. The advertisement shall be free from any and all deceptive or misleading information." Miss. Code Ann. § 41-121-7(1) (Rev. 2013).

¶13. Dr. Barlow argues that the provision in Section 41-121-3 providing for "a compelling state interest in patients being promptly and clearly informed of the actual training and qualifications of their health care practitioners" *requires* him to inform his patients of his DACNB and other certifications, and thus implicitly repeals or amends the provision of Section 73-6-25(1)(a) that restricts chiropractors to a short list of titles. The Board focuses its rebuttal argument on the concept that Section 41-121-3 does not implicitly repeal or amend Section 73-6-25. But this Court need not even perform that analysis, because Section 41-121-3 simply does not mean what Dr. Barlow claims it means.

¶14. The Act very clearly has the purpose of ensuring that patients can differentiate among the different types of doctors. Indeed, the Act requires that advertisements must identify the type of *license* held according to the Act's *definitions*. Miss. Code Ann. § 41-121-7(1) (Rev. 2013). The only *license* that the record reveals that Dr. Barlow holds is a doctor of chiropractic. His additional certifications are not licenses. Nor are they included in the Act's definitions, which identify only the category of "practitioners of chiropractic." The Act in no way requires that a practitioner reveal every certification he or she possesses. Taken to

8

its logical conclusion, Dr. Barlow's interpretation of Section 41-121-3 would even *require* that he reveal his certification as a Diplomat of Pastoral Science from the Pastoral Medical Association. Viewing the Act as a whole, instead of one sentence in isolation, it is very clear that the purpose of the Act is for the various types of doctors to reveal the type of doctors they are, i.e., to reveal the particular licenses they hold, so that a patient will not, for example, show up to a dentist's office for prenatal care. Because Section 41-121-3 is completely consistent with Section 73-6-25, and because Dr. Barlow's interpretation of Section 41-121-3 is simply incorrect, Section 41-121-3 clearly does not repeal or amend, implicitly or otherwise, Section 73-6-25.

### *4. First Amendment*

¶15. Dr. Barlow argues that Section 73-6-25 impermissibly infringes on his First Amendment right to free speech. First Amendment protection has been extended to commercial speech. *In re R.M.J.*, 455 U.S. 191, 199, 102 S. Ct. 929, 71 L. Ed. 2d 64 (1982). The government may proscribe commercial speech that is misleading or related to unlawful activity. *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 563-64, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980). Specifically, advertising for professional services presents special possibilities for deception due to the "public's comparative lack of knowledge, the limited ability of the professions to police themselves, and the absence of any standardization in the 'product.'" *In re R.M.J.*, 455 U.S. at 202. Thus, advertising for professional services is "especially susceptible to abuses that the States have a legitimate interest in controlling." *Id.* Therefore, "regulation – and imposition of

9

discipline – are permissible where the particular advertising is inherently likely to deceive or where the record indicates that a particular form or method of advertising has in fact been deceptive." *Id.* If the advertising is not misleading, the State must assert a substantial interest in regulating the speech, and the interference "must be in proportion to the interest served." *Id.*

¶16. In this case, the testimony of three witnesses, the patient, and Drs. Patterson and Rutherford, evinced that the advertisements at issue were misleading. Dr. Barlow did not define the acronyms he placed behind his name, and he referred to himself as a "chiropractic neurologist," which the witnesses testified led to confusion for patients that they were seeing a medical doctor. Because evidence exists that the advertisements at issue were actually misleading, this Court need not analyze the issue further. Based on the specific facts of this case, the discipline for the advertisements did not violate Dr. Barlow's First Amendment rights.[5]

---

[5]We do not hold that Section 73-6-25 may never infringe upon First Amendment rights, but simply that it does not do so in this particular case. We note that the United States Supreme Court has frowned upon absolute restrictions on advertising regarding certifications. "[T]he States may not place an absolute prohibition on certain types of potentially misleading information, *e.g.*, a listing of areas of practice, if the information also may be presented in way that is not deceptive." *Id.* at 203; *see also* ***Peel v. Attorney Registration & Disciplinary Comm'n of Illinois***, 496 U.S. 91, 110 S. Ct. 2281, 110 L. Ed. 2d 83 (1990) (plurality opinion) (finding an absolute bar on lawyer advertising a certification violated the First Amendment, where there was no showing that the burden on the bar association of distinguishing between certifying boards that are bona fide and those that are bogus would be significant, and where there was "a complete absence of any evidence of deception in the present case."); *see also* ***American Acad. of Pain Mgmt. v. Joseph***, 353 F.3d 1099 (9th Cir. 2004) (California legislature could regulate which medical professionals could use the designation "board certified" by determining which boards met certain qualifications; the court noted that the legislature did *not* ban medical professionals from advertising that they had a certification from a nonqualifying board or organization; the

## 5. Costs

¶17.    Dr. Barlow argues that the Board's assessment of a $3,216 fee for "the costs associated with its investigation and prosecution of this matter" was beyond the Board's statutory authority, and was not supported by substantial evidence.  The Board makes several arguments in response.  First, it argues that the Board is allowed to consider the costs of investigation in determining the amount of penalties.  Second, the Board alleges in its brief that Dr. Barlow committed at least eight violations, and that for each of these the Board was allowed to assess a $500-$1,000 penalty, thus the total of $3,216 was less than what it was allowed to assess.  Third, the Board seems to argue that it offered in its letter to correct the terminology in its order, and that Dr. Barlow should have allowed it to do so and wrongly prevented it from doing so by filing his appeal.  Dr. Barlow is correct that the Board lacked authority to directly assess him the costs of the investigation, and each of the Board's arguments will be addressed below.

¶18.    The governing statute allows the Board to assess monetary penalties for violations found.[6]   However, it does not explicitly allow the Board to assess the costs of the

legislature had simply prohibited them from using the words "board certified" in that case). Barlow did not place evidence other than his own testimony in the record that this certification was indeed a reliable certification from a bona fide organization.  Under the particular facts of this specific case, we simply cannot find a First Amendment violation.

[6]The statute provides that, in lieu of revocation, suspension, or cancellation of a license, the Board may levy

(a) For the first violation, a monetary penalty of not less than Five Hundred Dollars ($500.00) nor more than One Thousand Dollars ($1,000.00) for each violation.
(b) For the second and each subsequent violation, a monetary penalty of not

11

investigation to the party disciplined. The Legislature has clearly and explicitly allowed the governing bodies of many professions to recoup the costs of an investigation.[7] While it is problematic that the Board may be discouraged from investigating if it cannot recoup fees, and while it is entirely possible that the lack of authority for the chiropractic board, as well as for several other professional boards, to recoup those fees may be a mere oversight by the Legislature, this Court cannot read that authority into the statute where it does not exist.[8] The Legislature has shown that, when it wants to specifically provide that a professional governing body can recoup investigatory costs, it is perfectly willing to do so.

¶19. The Board argues that in assessing a penalty for each violation, it is allowed to

---

less than One Thousand Dollars ($1,000.00) nor more than Two Thousand Five Hundred Dollars ($2,500.00) for each violation.

Miss. Code Ann. § 73-6-19(6) (Rev. 2012).

[7]The Legislature has specifically provided that the governing bodies of many professions may recoup the costs of an investigatory proceeding from the party disciplined. *See, e.g.,* Miss. Code Ann. § 73-1-29(7) (architects); Miss. Code Ann. § 73-2-16(8) (landscape architects); Miss. Code Ann. § 73-4-19(7) (auctioneers); Miss. Code Ann. § 73-9-61(4)(d) (dentists); Miss. Code Ann. § 73-11-57(6)(d) (funeral services providers); Miss. Code Ann. § 73-13-37(7) (engineers); Miss. Code Ann. §§ 73-13-89 & 73-13-37 (land surveyors); Miss. Code Ann. § 73-17-15(1)(b) (nursing home administrators); Miss. Code Ann. § 73-21-103(1)(d)(iii) (pharmacists); Miss. Code Ann. § 73-23-64(7) (physical therapists); Miss. Code Ann. § 73-25-30 (physicians); Miss. Code Ann. § 73-33-11(5) (public accountants); Miss. Code Ann. § 73-42-34(3) (athlete agents); Miss. Code Ann. § 73-53-23(7) (social workers); Miss. Code Ann. §§ 73-54-29 & 73-53-23 (marriage and family therapists); Miss. Code Ann. § 73-63-43(7) (geologists); Miss. Code Ann. § 73-67-27(3)(d) (massage therapists); Miss. Code Ann. § 73-73-31(8) (interior designers); Miss. Code Ann. § 73-75-19(2) (behavior analysts).

[8]To the extent this may be an oversight by the Legislature, we encourage the Legislature to update the statute; however, this Court cannot add to the statute what the Legislature did not provide.

consider the costs of its investigation. The Board has wide discretion in determining what penalty, between $500 and $1,000, to assess. Certainly, the Board may consider its costs when determining the penalty, and this Court recognizes the Board's right so to do. But, by the very plain language of the Board's final order, that is not what occurred here. It simply did not make the findings in this case to support that the costs were part of the penalty assessed. The Board assessed Dr. Barlow a $500 penalty under the statute, and then separately charged him a $3,216 fee that was specifically described as serving to recoup the costs associated with the investigation. The fee was explicitly and specifically separated from the statutory penalty the Board dealt Dr. Barlow.[9] Thus, it is clear that this was not a penalty within which the Board considered its costs. It was a fee separate and apart from the penalty assessed.

¶20.    Second, the Board essentially argues that the penalty is harmless error, because it is less than what it could have assessed Dr. Barlow for his at least eight violations. The problem with this argument is that the Board made utterly no findings in its order or otherwise as to how many violations Dr. Barlow committed. In fact, it explicitly fined him for only one violation, by assessing the $500 penalty, and only one $500 penalty. In its undated letter to Dr. Barlow, the Board claimed that Dr. Barlow had committed at least five violations. Now, in its brief on appeal, that number has changed again to at least eight

---

[9]It even stated that Dr. Barlow "must pay the monetary penalty *and costs assessed herein* within thirty (30) working days following the date of the entry of this Final Order." (Emphasis added.)

13

violations. Yet, the findings of fact must govern,[10] and the findings of fact do not quantify the number of violations. Thus, this Court cannot know for certain how many violations the Board found at its hearing, and the penalty the Board assessed indicates it found only one. This argument therefore fails.

¶21.    The Board also alleges that Dr. Barlow should have told it that he wanted it to correct the terminology in its order. Dr. Barlow had thirty days to appeal the order. Miss. Code Ann. § 73-6-19(5) (Rev. 2012). He appealed the order to the circuit court on the twenty-fourth day, so he certainly was not rushing to circumvent Board action. Moreover, the record contains no indication as to the date the Board asked Dr. Barlow to request a correction to its final order. It may be that the letter was sent after he had filed his appeal. The Board cannot claim the benefit of an undated letter, with no indication in the record as to when the letter was sent and/or received. Moreover, the argument that Dr. Barlow was required to request that the Board correct its order, especially when the order was clear in the first place, is spurious.

¶22.    Because assessing the costs of investigation to Dr. Barlow was beyond the power of the Board, and because the order clearly and specifically stated that the $3,216 fee was for costs of the investigation, specifically distinguishing the fee from the statutory monetary penalty assessed, and because the Board failed to make any findings regarding the number of violations committed by Dr. Barlow (which is especially noteworthy given that the Board

---

[10]The changing number of violations alleged by the Board over the course of this litigation, from no specified number to at least five to at least eight, illustrates why the administrative record and findings of fact must govern.

has since changed its argument from Dr. Barlow having committed at least five violations to Dr. Barlow having committed at least eight violations), this Court reverses and renders the $3,216 assessed to Dr. Barlow in this case.

## CONCLUSION

¶23.   This Court affirms the judgments of the Board and circuit court in part, and reverses and renders in part.  Dr. Barlow's arguments regarding the standard of review of the circuit court, the implicit repeal of Section 73-6-25, and the violation of his First Amendment rights are all without merit.  However, the Board did not have the authority to impose the costs of the investigation directly on Dr. Barlow and this Court reverses and renders the $3,216 assessment in favor of Dr. Barlow.

¶24.   **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**WALLER, C.J., RANDOLPH, P.J., KITCHENS, COLEMAN, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR.  DICKINSON, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, J.**

**DICKINSON, PRESIDING JUSTICE, SPECIALLY CONCURRING:**

¶25.   A commercial advertisement may be false or—as in the case before us—truthful.  A factfinder may find a truthful advertisement to be *actually* misleading where it actually has misled one or more members of the public.  The factfinder may find the same advertisement to be *potentially* misleading where no person actually claims to have been misled.

¶26.   For reasons unexplained by the United States Supreme Court, the First Amendment provides protection for truthful advertisements that are potentially misleading, but no protection where a single, random person—whether reasonably or not—claims to have been

misled.[11]  In other words, the Supreme Court has concluded that identical speech in identical contexts receives varying degrees of protection from the First Amendment based solely upon a single random individual's subjective confusion.

¶27.    In 1982, the Supreme Court held that "[t]ruthful advertising related to lawful activities is entitled to the protections of the First Amendment," and "States may not place an absolute prohibition on certain types of *potentially* misleading information, *e.g.*, a listing of areas of practice, if the information also may be presented in a way that is not deceptive."[12]

¶28.    When the Legislature enacted Mississippi Code Section 73-6-25, it did what the United States Supreme Court has said it cannot do.  Regardless of truth, legality, disclaimers, or whether anyone actually has been misled, Section 73-6-25 imposes an absolute prohibition against chiropractors using any professional designation other than those listed in the statute.[13]  Thus, the Legislature has crafted a statute lacking adequate consideration for the First Amendment concerns it creates.

---

[11] *In re R.M.J.*, 455 U.S. 191, 203, 102 S. Ct. 929, 937, 71 L. Ed. 2d 64 (1982) ("Misleading advertising may be prohibited entirely. But the States may not place an absolute prohibition on certain types of potentially misleading information."); *see also Peel v. Attorney Registration and Disciplinary Comm'n of Ill.*, 496 U.S. 91, 100–1, 110 S. Ct. 2281, 2288, 110 L. Ed. 2d 82 (1990) ("The facts stated on petitioner's letterhead are true and verifiable. It is undisputed that NBTA has certified petitioner as a civil trial specialist and that three States have licensed him to practice law. There is no contention that any potential client or person was actually misled or deceived by petitioner's stationery.").

[12] *In re R.M.J.*, 455 U.S. at 203 (emphasis added).

[13] Miss. Code Ann. § 73-6-25(1)(a) (Rev. 2012) ("The members of the chiropractic profession, licensed or unlicensed, are hereby *prohibited from*: (a) Making . . . use of any other professional designation other than the term 'chiropractor,' 'doctor of chiropractic,' 'D.C.' or 'chiropractic physician. . . . .'") (emphasis added).

¶29.    According to *In Re R.M.J.*, a statute may not ban truthful advertisements which have not misled anyone, nor may it ban truthful advertisements with appropriate disclaimers.  But here, Section 73-6-25 survives by the skin of its teeth.  Dr. Barlow's advertising related to a lawful activity—operating a chiropractic practice—and nothing suggests he lacked the expertise he claimed, or that he does not possess the professional designation in his advertisement: "Chiropractic Neurologist."  In fact, the Board's own investigator testified that Dr. Barlow's "chiropractic neurology degree" required him to take an additional 1,600 hours of continuing education above that required of a Doctor of Chiropractic, and that a person with "a chiropractic neurology degree would have -- you would have a much better understanding of neurological issues that may be going in the body and be able to recognize other issues."  And Dr. Barlow provided uncontradicted testimony that his area of expertise included chiropractic neurology.  So the question is whether Dr. Barlow's "[t]ruthful advertising related to lawful activities is entitled to the protections of the First Amendment,"[14] preventing the State from placing an absolute ban on it.

¶30.    One would think so.  But, for reasons unapparent and seemingly inexplicable, the United States Supreme Court has held that while "States may not place an absolute prohibition on certain types of potentially misleading information,"[15] they may place an absolute prohibition on the exact same truthful commercial speech related to a lawful activity

---

[14] *In re R.M.J.*, 455 U.S. at 203.

[15] *Id.*

*if* it has actually misled or confused some customer or patient.[16]

¶31.    Here, the Board heard testimony from a single patient that Dr. Barlow's advertisement had confused her.   For that reason, and that reason alone, Section 73-6-25 is not unconstitutional as applied in this case.   In other words, but for one individual's subjective—and arguably unreasonable—confusion, this statute as applied in this case would violate the First Amendment because it does not allow for appropriate disclaimers to truthful advertisements that potentially are misleading.

**COLEMAN, J., JOINS THIS OPINION**.

---

[16] ***Id.*** ("Misleading advertising may be prohibited entirely. But the States may not place an absolute prohibition on certain types of potentially misleading information."); *see also **Peel***, 496 U.S. at 100–1 ("The facts stated on petitioner's letterhead are true and verifiable. It is undisputed that NBTA has certified petitioner as a civil trial specialist and that three States have licensed him to practice law. There is no contention that any potential client or person was actually misled or deceived by petitioner's stationery.").

18